UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

RONNIE J. THORNTON                         CIVIL ACTION

VERSUS                                     NO: 07-1839

DIAMOND OFFSHORE DRILLING,                 SECTION: R(1)
INC.

## ORDER AND REASONS

The following motions are before the Court: (1) the parties'
cross-motions *in limine* concerning the admissibility of the
Incident Investigation Report, job safety analysis (JSA)
worksheets, HSE Alert bulletin, and evidence of subsequent
remedial measures; (2) plaintiff's motion *in limine* concerning
the admissibility of portions of the anticipated testimony of
defendants' medical expert; and (3) plaintiff's unopposed motions
to exclude evidence related to his criminal history and receipt
of collateral source benefits. For the following reasons, the
Court (1) GRANTS in part and DENIES in part each party's motion
concerning the admissibility of the Incident Investigation

Report, JSA worksheets, the HSE Alert bulleting, and evidence of
subsequent remedial measures; (2) GRANTS in part and DENIES in
part plaintiff's motion *in limine* concerning the testimony of
defendants' medical expert; and (3) GRANTS plaintiff's remaining
motions *in limine*.


I.   **BACKGROUND**

     This case arises out of an industrial accident that occurred
on an offshore drilling rig and involves claims of negligence and
unseaworthiness brought under the Jones Act, 46 U.S.C. §
30104(a), and the general maritime law, respectively. On April 7,
2006, plaintiff Ronnie Thornton was employed as a derrickman by
defendant Diamond Offshore Management Company aboard the *J/U
Ocean Drake*, a rig owned and operated by co-defendant and
affiliated corporation, Diamond Offshore Services Company. (The
Court refers to both defendants collectively as "Diamond.")
Thornton, who had worked offshore for 16 years, was engaged in
the task of "tripping pipe" or adding lengths of pipe into the
well hole. To thread lengths of pipe together as they were fed
into the well hole, Thornton used a Spin Master hydraulic wrench
manufactured by Hawk Industries, Inc. Operation of the Spinner
Hawk wrench involves the use of two levers located inches apart
from each other: the operator moves the "clamp lever" to open and

2

close the wrench's jaws around the drill pipe and depresses the
"spin lever" to spin the chain, which is powered by a hydraulic
pump, that tightens the sections of pipe to one another. Thornton
alleges that on the night of April 7 he was responsible for
training two junior employees on pipe tripping operations and
that he was the only crew member operating the wrench when it
malfunctioned. He contends that, due to a leak in the wrench's
hydraulic system, the chain's sprocket would continue to rotate
slowly when the spin lever was not engaged, causing the chain to
ball up and tighten on itself. This chain binding prevented the
wrench jaws from tightening around the pipe, essentially
rendering the wrench useless. To loosen the chain, Thornton
grabbed the chain with one hand and used the other to tap the
spin lever so that the sprocket would turn and ease the process
of loosening the kinks in the chain. Thornton contends that he
had to stand in front of the wrench in close proximity to the
jaws and reach around the wrench console to operate the levers.
Thornton could not see the levers and instead had to operate them
by touch. Thornton mistakenly depressed the clamp lever, causing
the wrench jaws to close around his left arm, crushing the bones
in his forearm and hand. Thornton was airlifted to West Jefferson
Medical Center, where he was hospitalized for 11 days. He
ultimately underwent two orthopedic surgeries to repair broken

3

bones and eight plastic surgeries to repair his skin and soft tissue damage.

Thornton alleges that he used the Spinner Hawk wrench because the "Iron Roughneck," a more highly automated piece of equipment, was broken. He further alleges that the leaky hydraulic pump on the spinning wrench had been a long-standing problem and that his immediate supervisor was aware of the malfunction and had sanctioned the method of manually loosening the wrench's chain that Thornton had employed. Thornton alleges that crew members, when faced with this wrench malfunction, were left to devise methods to maintain the flow of operations rather than suspend work to repair the broken equipment.

After the accident, Diamond took several steps to address the accident. On April 8, 2006, the day after the accident, a team of Diamond employees and the representatives of Chevron, the rig operator, investigated the accident and summarized their findings and recommendations in an "Incident Investigation Report." The report is divided into four sections. The first section, "Description of the Incident," summarizes the events of the accident. The second section, "Results of the Investigation," analyzes the root causes of the accident and the operational procedures that crewmembers used. The report noted that although a simulated operation of the wrench did not reveal any

operational deficiencies, employees were "accustomed to fixing the chain on the spinning wrench whenever its [*sic*] not laying properly." ("Incident Investigation Report," R. Doc. 39-4 at 9.) The report further observed that "[t]he culture onboard accepted this [method of untangling the chain] as common practice and didnt [*sic*] recognize the hazard." (*Id.*) It noted that Thornton had "been on this rig and in this position for a significant amount of time and apparently [had] performed this action repeatedly in the past while operating the spinning wrench." (*Id.*) The report further noted that the control levers on the wrench were not marked and were located "only one inch apart." (*Id.*) The investigation also revealed that Diamond had not prepared an equipment-specific job safety analysis (JSA) worksheet on the use of the particular Spinner Hawk wrench involved in this accident and that although the pipe-tripping JSA that was reviewed before the operation does mention hazards, it was "not extensive enough to ensure a safe operation." (*Id.*) The third section, titled "Why this Incident Occurred," summarizes the results of the investigation. There, the investigators noted that "[i]t was common practice to fix the lay of the chain in the spinning wrench with the use of one's hand," that "[t]his action was not recognized as a hazard, and that Lockout/Tagout isolation was not deemed as being needed for this action." (*Id.* at 10.) In

5

the fourth section of their report, titled "Recommendations," the investigators recommended that to prevent this type of accident from happening again (1) rig personnel should complete Lockout/Tagout training at earlier dates than previously scheduled and that the training should include instructions on hydraulic and pneumatic equipment in addition to electrical machinery; (2) the development of an equipment-specific JSA for the Spinner Hawk wrench; (3) the implementation of a policy that two crewmembers be assigned to operate the wrench and that such individuals receive formal training on wrench operations with an emphasis on proper body positioning; (4) that the levers be labeled according to their function; (5) that Diamond consider replacing the spinner wrench with a "roller type" spinning wrench that includes a safety mechanism that does not allow the jaws to clamp unless they are around a drill pipe, specifically a "Varco SSW-40"; (6) the preparation of a Health and Safety Executive (HSE) Alert for distribution to other rigs in the Diamond fleet; and (7) the development of a training presentation on equipment malfunction to address the culture among crewmembers that only some equipment failures warrant suspension of operations. (*See id.* at 10.) Attached to the report is a list of "Incident Recommendation Action Items" that summarizes the follow-up actions taken in response to the report.

6

After the report was completed, Diamond modified the pipe-tripping JSA worksheet and prepared an equipment-specific JSA for the spinning wrench in which it listed potential hazards associated with operation of the wrench and protocols to minimize the risk of injury. (*See* JSA Worksheet, R. Doc. 39-4 at 14-18.) Diamond also distributed an HSE Alert bulletin to other rigs in its fleet describing the circumstances of Thornton's accident and instructing crew supervisors to prepare individual JSA worksheets for any spinning wrenches used on their rigs and to provide training for crew members operating spinning wrenches. (*See* HSE Alert, R. Doc. 39-4 at 25.) Further, Diamond employees have testified that at the insistence of Chevron, Diamond replaced the hydraulic Spinner Hawk wrench with a Varco SSW-40 Spinning Wrench that does not rely on a chain to spin the pipe and includes an operational trigger that will not actuate unless the wrench jaws are touching the pipe. (*See* Dep. of James White at 27:10-21, R. Doc. 39-5 at 3; Dep. of Tim Taylor at 17:7-11, R. Doc. 39-5 at 13.)

## II.  EVIDENCE OF SUBSEQUENT REMEDIAL MEASURES, FED. R. EV. 407

The parties have filed cross motions *in limine* concerning the admissibility of evidence of the Incident Investigation Report and the follow-up actions that Diamond took with respect

7

to the spinning wrench, including the preparation of the modified pipe-tripping JSA and the equipment-specific JSA, the HSE Alert bulletin, and the replacement of the Spinner Hawk wrench on the *J/U Ocean Drake* with the pneumatic Varco SSW-40 Spinning Wrench. Diamond asserts that these items constitute evidence of subsequent remedial measures that are inadmissible under Federal Rule of Evidence 407. In response, Thornton contends that none of the documents contains evidence of remedial measures that Diamond took in response to the accident as they are merely reports about the accident and further that testimony about the wrench replacement will be offered to show the feasibility of using a different piece of equipment and for impeachment purposes, not to show Diamond's negligence.

> Rule 407 of the Federal Rules of Evidence provides:
>
> When, after an injury or harm allegedly caused by an event, measures are taken that, if taken previously, would have made the injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove negligence, culpable conduct, a defect in the product, a defect in the product design, or a need for a warning or instruction. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

The commentary to Rule 407 explains that "the most impressive[] ground for exclusion rests on a social policy of encouraging people to take, or at least not discouraging them from taking,

8

steps in furtherance of added safety." Fed. R. Ev. 407, advisory committee's note (1972). In light of this policy, courts have taken care to exclude evidence of remedial measures when their admission would imply fault for the accident and resulting harm that occurred. *See, e.g., Mills v. Beech Aircraft Corp.*, 886 F.2d 758, 763 (5th Cir. 1989). The Advisory Committee's Note states, however, that "[e]xclusion is called for only when the evidence of subsequent remedial measures is offered as proof of negligence or culpable conduct." *Id.*

### A. The Incident Investigation Report, JSA Worksheets, and HSE Alert Bulletin

In considering whether the Incident Investigation Report, the JSA Worksheets and the HSE Alert are inadmissible under Rule 407, the Court must evaluate the extent to which these documents contain evidence of actual remedial measures that Diamond took in response to the accident. The Fifth Circuit recently explained that the text of Rule 407 "only prohibits evidence . . . of subsequent remedial measures, not evidence of a party's analysis" of a defective product or piece of equipment or accident. *Brazos River Authority v. GE Ionics, Inc.*, 469 F.3d 416, 430 (5th Cir. 2006) (internal quotations and citations omitted). The Fifth Circuit embraced the view of the First Circuit and a chorus of other courts that "'[t]he fact that the analysis may often result

in remedial measures being taken . . . does not mean that evidence of the analysis may not be admitted.'" *Id.* (quoting *Prentiss & Carlisle Co. v. Koehring-Waterours Div. of Timberjack, Inc.*, 972 F.2d 6, 9 (1st Cir. 1992)). *See also Wilson v. Beebe*, 770 F.2d 578, 590 (6th Cir. 1985) (explaining that defendant police officer's Rule 407 argument to exclude a report following a police shooting had no merit because it "*did not recommend* a change in procedures following the shooting; it was a report of that incident and nothing more") (emphasis added); Rocky *Mountain Helicopters v. Bell Helicopters*, 805 F.2d 907, 918 (10th Cir. 1986) (upholding admission of helicopter manufacturer's post-accident "stress test" of potentially defective component because "[i]t would strain the spirit of the remedial measure prohibition in Rule 407 to extend its shield to evidence contained in post-event tests or reports"); *Fasanaro v. Mooney Aircraft Corp.*, 687 F. Supp. 482, 487 (N.D. Cal. 1988) (holding that although "the policy considerations underlying Rule 407 are to some extent implicated in the context of post-event tests, [ ] it would extend the Rule beyond its intended boundaries to include such tests within its ambit" and that "[p]ost-event tests will not, in themselves, result in added safety"). In *Brazos River Authority*, the Fifth Circuit explained that post-accident investigations and tests do not fall within the exclusionary ambit of Rule 407

10

because "by themselves, post-accident investigations would not make the event 'less likely to occur;' only the actual implemented changes make it so." *Brazos River Authority*, 469 F.3d at 430. See *also* 2 Weinstein, *et al.*, *Federal Evidence* (2d ed. 1997) § 407.06[1] ("It is only if changes are implemented as a result of the tests that the goal of added safety [under Rule 407] is furthered; and even then, it is only evidence of those changes that is precluded by the rule.").

The Court determines that the Incident Investigation Report itself is admissible except for the recommendations and the addendum documenting Diamond's follow-up action, which constitute evidence of subsequent remedial measures and are therefore inadmissible. As discussed, *supra*, courts have recognized that the admission of the results of tests and the findings of investigations conducted after an accident is consistent with Rule 407's purpose of encouraging safety improvements. The rule protects a party from having subsequent remedial measures used against it as evidence of its negligence in the first instance and thus helps to avoid the socially undesirable consequence of a party's reluctance to make safety improvements out of a fear of increased exposure to liability. But to read Rule 407 as barring test results and investigative findings altogether "'goes too far and fails to credit the social value of making available for

11

trial what is often the best source of information.'" *Brazos River Authority*, 469 F.3d at 431 (citing *Westmoreland v CBS, Inc.*, 601 F. Supp. 66, 67 (S.D.N.Y. 1984)). In *Westmoreland*, retired U.S. Army General William C. Westmoreland sought to introduce an internal, self-critical report prepared by CBS News on a news story that it had prepared on Wetmoreland's operations in the Vietnam War. The version of the report that Westmoreleand sought to introduce specifically excluded reference to subsequent remedial measures that the news agency planned to take to ensure reporting integrity. *See Westmoreland*, 601 F. Supp. at 67. The *Westmoreland* court rejected CBS News's argument that Rule 407's exclusionary force extended to tests and investigations, observing that "[i]n industrial and railroad accident litigation, for example, it is commonplace that such reports, or at least the facts revealed by them, are used by the injured to establish the liability of the company that conducted the investigation." *Id.* at 67-68 (citing cases). The first three sections of Diamond's Incident Investigation Report fall squarely within the recognized scope of admissible investigative findings. The first section titled "Description of the Incident" describes what happened during Thornton's accident. The second, "Results of the Investigation," lists the root causes of the accident. And the third, "Why this Incident Occurred," essentially summarizes the

results of the investigation. These portions of the report mirror closely the test results and investigative findings that courts have recognized as lying beyond the exclusionary reach of Rule 407, and they do not include references to subsequent remedial measures. *Cf. Prentiss & Carlisle Co.,* 972 F.2d at 9-10 (upholding admission of internal investigative reports analyzing the cause of a fire in timber-harvesting machine that did not mention any remedial measures); *Wilson*, 770 F.2d at 590 (explaining that defendant's Rule 407 argument to exclude the findings of a police shooting investigation had "no merit" because "it was a report of [the] incident and nothing more"). Accordingly, the first three sections of the Incident Investigation Report are admissible.

The fourth section, titled "Recommendations," and the addendum cataloging Diamond's follow-up actions, however, constitute evidence of subsequent remedial measures and are therefore inadmissible. In the fourth section, the report lists a number of steps that Diamond should take to prevent the recurrence of the type of accident in which Thornton was involved. The addendum documents the company's response. Courts that have admitted internal investigative reports and tests have emphasized that such reports did not include evidence of recommendations or whether the party had acted on such

13

recommendations. *See e.g., Wilson*, 770 F.2d at 590 (admitting police-shooting investigation report and emphasizing that "[t]he report *did not recommend a change in procedures following the shooting*; it was a report and nothing more"). Although the issue of whether recommendations for new policies and/or safety measures did not clearly arise in many of the cases admitting investigative reports discussed *supra*, the Court finds that the policy considerations underlying Rule 407 would be implicated by the admission of such recommendations. Although recommendations are not remedial measures that have been implemented, they are of the same character in that they reflect a party's post-accident considerations and thinking about policy changes and safety improvements. Such recommendations go beyond "the initial steps toward ascertaining whether any remedial measures *are called for*," *Fasanaro*, 687 F. Supp. at 487 (N.D. Cal. 1984) (emphasis added), as they relate to a course of future conduct. They do not speak directly to the cause of an accident, which is the recognized basis for admitting investigative findings and test results.

Thornton relies heavily on the ruling by another section of this Court in *Robinson v. Diamond Offshore Management Co.*, No. Civ. A. 04-1899, 2006 WL 197010 (E.D. La. Jan. 26, 2006), which involved a similar evidentiary problem arising out of an accident

14

aboard the same rig to which Thornton was assigned. In *Robinson*, the plaintiff sought to introduce a copy of the injury investigation report that Diamond had prepared and which included recommendations for future safety measures and corrective action. *Id.* at *1. Relying on the same decisions that the Fifth Circuit later embraced in *Brazos River Authority*, the *Robinson* court admitted the report, including its recommendations, because "recommended measures are not themselves remedial measures and are not excluded by" Rule 407. *Id.* at *3. The cases on which the *Robinson* court relied, however, did not involve situations in which the admitted investigation reports and test results included internal recommendations for remedial action. *See Dow Chem. Corp. v. Weevil-Cide Co.*, 897 F.2d 481, 487-88 (10th Cir. 1990) (explaining that "[r]emedial measures are those actions taken to remedy flaws or failures" and reversing exclusion of internal memorandum discussing whether plaintiff chemical manufacturer should withdraw from a particular chemical market because there was "nothing remedial about the report's recommendation that [plaintiff] remain in the [market] without conducting further medical research"); *Rocky Mountain Helicopters*, 805 F.2d at 918-919 (upholding admission of parts test in products-liability litigation after district court excluded "*any reference*" to product redesign) (emphasis added);

15

*In re Aircrash in Bali*, 871 F.2d 812, 817 (9th Cir. 1989) (upholding admission of aircraft investigation report *prepared by FAA, not defendant airline*, that recommended subsequent safety measures) (*see* discussion *infra*); *Fasanaro*, 687 F. Supp. at 496-87 (admitting only test results of defective airline parts in products-liability action and not recommendations for subsequent redesign or other measures). Despite the ruling in *Robinson*, this Court concludes that the recommendations for changes in safety procedures contained in the Incident Investigation Report fall within the scope of Rule 407. The Court finds instructive the Fifth Circuit's favorable citation to the reasoning in *Wilson,* 770 F.2d at 590, that internal police department report into an officer-shooting was admissible because "[t]he report did not recommend a change in procedures following the shooting; it was a report of that incident and nothing more." *See Brazos River Authority*, 469 F.3d at 430 n.9 (citing *Wilson*, 770 F.2d at 590). Here, a portion of the incident report contains more than just investigative findings on causation. Accordingly, plaintiff may admit the Incident Investigation Report, but he must redact the section titled "Recommendations" and the addendum listing subsequent actions.

   With respect to the modified pipe-tripping JSA worksheet and the equipment-specific JSA worksheet for operation of the Spinner

16

Hawk wrench, the Court finds that both JSAs constitute evidence of subsequent remedial measures and are therefore inadmissible to show Diamond's negligence under Rule 407. The Incident Investigation Report specifically recommended the preparation of both JSAs. Therefore, the JSAs themselves are actual measures that Diamond implemented after the accident. Thornton argues that he does not intend to elicit testimony or introduce any other evidence that these JSAs were prepared after this accident, but plans to introduce them to establish only what Diamond should have done to prepare Thornton to operate the Spinner Wrench. Despite Thornoton's statement that he will not introduce temporal evidence about the genesis of these documents, by his own explanation, Thornton seeks to use these documents to establish the negligence of Diamond by showing what policies and procedures *should have been in place*. Evidence of Diamond's post-accident policy to show that Diamond had taken insufficient safety precautions constitutes the very kind of evidence governed by Rule 407. That is not to say that Thornton is barred from introducing the JSAs for impeachment purposes or to show the feasibility of employing different safety techniques. Under Rule 407, if Diamond introduces evidence to establish that Thornton ignored existing safety protocols, company policies, or instructions or that it would not have been feasible to develop

17

safety protocols or hold safety meetings on the Hawk Spinner Wrench before the accident occurred, then Thornton may introduce the modified JSAs to show feasibility or for impeachment.

With respect to the HSE Alert bulletin, the Court concludes that, similar to the Incident Investigation Report, the portions of the bulletin that report the investigative findings are admissible but the section titled "Action Items" that documents the remedial measures that other rigs in the fleet must take to prevent a similar accident is inadmissible. Those announcements about changes in safety protocols make the bulletin materially indistinguishable from the press release that was excluded on Rule 407 grounds in *Specht v. Jensen*, 863 F.2d 700 (10th Cir. 1988). In *Specht*, the plaintiffs, whose home was subject to an allegedly illegal search, sought to introduce a press release prepared by the local municipality announcing the controversy, stating the officers involved had exercised poor judgment, and that "appropriate disciplinary action would be taken." *Id*. at 701. The Tenth Circuit explained that the press release "set[ ] out remedial measures taken by the City to prevent the recurrence of the poor judgment the investigation revealed, and is therefore within the ambit of Rule 407." *Id*. Here, the HSE Alert contains a directive that supervisory rig personnel must discuss its contends with crewmembers and add it to the rig's "Master Action

List." For the same reasons discussed in the context of the Incident Investigation Report, Thornton may submit the HSE Alert, but he must redact the "Action Items" section.

**B.   Evidence of the Replacement of the Spinner Hawk Wrench**

Diamond also moves to exclude evidence of the replacement of the Spinner Hawk Wrench on the *Ocean Drake* with a pneumatic wrench that utilizes different safety features under Rule 407. Thornton, on the other hand, argues that evidence of the replacement is admissible because Diamond took action not of its own volition but only at the direction of the third-party drilling operator, Chevron. He also argues that it is admissible because there is a dispute about the feasibility of an earlier replacement.

With respect to whether evidence of the replacement is admissible because a third party mandated the remedial measure, the facts before the Court do not support the application of the third-party or superior authority exception to Rule 407. Courts recognize that evidence of a subsequent remedial measure is admissible when the post-accident change is taken by a third party or made pursuant to a mandatory regulatory regime. *See, e.g., Koonce v. Quaker Safety Prods. & Mfg. Co.*, 798 F.2d 700, 719-20 (5th Cir. 1986); *Dixon v. Int'l Harvester Co.*, 754 F.2d 573, 584 (5th Cir. 1985); *O'Dell v. Hercules, Inc.*, 904 F.2d

1194, 1204 (8th Cir. 1990); *In re Aircrash in Bali, Indonesia*, 871 F.2d 812, 817 (9th Cir. 1989).

The Court notes at the outset that this case is different from the situation presented in *Dixon*, upon which Thornton relies. *Dixon* involved a products-liability action against the manufacturer of a tractor and the issue of whether evidence of changes to the tractor made by the plaintiff's employer, who was not a defendant in the suit, was admissible. Here, Thornton has not instituted a products liability action against Hawk Industries, the manufacturer of the spinning wrench involved in the accident.

Nor is there sufficient evidence that Diamond involuntarily swapped out the wrenches pursuant to the direction of a higher authority. *O'Dell* involved the admissibility of remedial measures that a chemical manufacturer of Agent Orange took to clean up its plant after its facility had been declared a Superfund site and the CDC, EPA, and another district court ordered it to do so. The Eighth Circuit explained that "[a]n exception to Rule 407 is recognized for evidence of remedial action mandated by superior governmental authority or undertaken by a third party because the policy of encouraging remediation would not necessarily be furthered by exclusion of such evidence." *O'Dell*, 904 F.2d at 1204. In the *Bali Aircrash* case the defendant airline sought to

exclude evidence of an FAA safety report prepared after one of its planes crashed. The Ninth Circuit upheld the admission of the report on the ground that it was "prepared by the FAA without the voluntary participation of Pan Am" and further explained that the purpose of Rule 407 "is not implicated in cases involving subsequent measures in which the defendant did not voluntarily participate . . . [because] the admission of that measure into evidence does not 'punish' the defendant for his efforts to remedy his safety problems." *In re Aircrash in Bali*, 871 F.2d at 817. Thornton attempts to argue that Diamond changed the wrench only at Chevron's insistence. But the evidence in support of his argument is weak. Unlike the cases that have recognized the superior authority exception, this case does not involve a regulatory change or investigative report prepared by a government authority. Rather, Thornton principally relies on the statement of Tim Taylor, Diamond's safety supervisor on the *Ocean Drake*, that during a meeting he held with Chevron's representative on the rig, the Chevron representative "was real adamant about changing the [Spinner Hawk wrench] out." (Taylor Dep. at 6-9.) There is no evidence, however, of the source of Chevron's authority vis-à-vis Diamond, or that Chevron threatened some sanction or penalty, contractual or otherwise, if Diamond did not make the change. On the facts before it, the Court cannot

conclude that Diamond made the change only as a result of a directive from a higher authority.

Thornton may introduce evidence of the equipment change, however, to demonstrate the feasibility of using a different wrench, if controverted. Rule 407 expressly provides for the introduction of remedial measures if a defendant controverts the feasibility of using an alternative piece of machinery. In his deposition, Diamond's safety supervisor, Taylor, appeared to waffle on whether it would have been feasible to use another wrench in place of the Spinner Hawk. At one point, he stated that if the rig crew had "realized [the Spinner Hawk] was a problem," then "yes," the change could have been made. (Taylor Dep. at 12: 5-6.) But he later stated responded to a question directly asking about the feasibility of using a different wrench and he said that if the crew had found the Spinner Hawk to be problematic and "could have found [alternative] equipment, and found it to be, you know, very similar to our work and needs, we probably could have arranged something, but that's all speculation." (*Id.* at 11:15-19.) Diamond asserts that it does not contest the feasibility of using a different wrench. But it has not stipulated to the issue of feasibility in the pretrial order. The concept of feasibility is somewhat elusive and arises most often in the context of products-liability litigation and the extent to

which a manufacturer could have designed a product differently. The Fifth Circuit has discussed feasibility in terms of whether a course of action is "impractical," *Grenada Steel Indus., Inc. v. Alabama Oxygen Co., Inc.*, 695 F.2d 883, 889 (5th Cir. 1983), and also described feasibility as relating "not only to physical possibility, cost and convenience, but also to ultimate utility and success in intended performance." *Reese v. Mercury Marine Div. of Brunswick Corp.*, 793 F.2d 1416, 1428 (5th Cir. 1986). It is not clear whether Diamond directly disputes the feasibility of using a different wrench. But if at trial, it takes the position that it was not reasonably feasible for it to acquire alternative devices suitable for use in pipe-tripping operations, then Thornton may introduce evidence of Diamond's decision to replace with spinning wrench with a pneumatic wrench to rebut that claim.

## III. ASPECTS OF THE TESTIMONY OF DIAMOND'S MEDICAL EXPERT, DR. RENNIE CULVER

Thornton also seeks to exclude various aspects of the testimony of Diamond's medical expert, Dr. Rennie Culver, and his medical examination report. Diamond has represented that Dr. Culver will not testify about many of the subjects about which Thornton has raised concerns.

First, Thornton seeks to prevent Dr. Culver from testifying

23

that Thornton's half-sister recently died of Lupus and from drawing the inference that Thornton would also likely suffer Lupus and therefore experience joint problems that would have shortened his worklife regardless of whether he had been injured. Diamond represents that Dr. Culver will not present testimony on this topic but only that her death might have contributed to Thornton's depression. Thornton does not dispute the admissibility of Dr. Culver's opinion about the cause of his depression. Accordingly, the Court GRANTS Thornton's motion with respect to Dr. Culver's testimony about the nature of the medical condition of Thornton's half-sister.

Second, Thornton seeks to prevent Dr. Culver from testifying that Thornton made certain statements during his examination that implicate his negligence in causing the accident. Such statements constitute admissions of a party and do not constitute hearsay. *See* Fed. R. Ev. 801(d)(2). Accordingly, Thornton's motions to exclude evidence of statements that he made during his exam evaluation are DENIED.

Third, Thornton seeks to prevent Dr. Culver from making any references to Thornton's earlier criminal conduct. Diamond does not oppose this motion and represents that Dr. Culver will not testify about Thornton's past criminal conduct. Accordingly, since Diamond has not established a basis for admission of

24

evidence of earlier criminal conduct, the Court GRANTS Thornton's motion to exclude reference to his criminal history.

Fourth, Thornton moves to exclude on hearsay grounds evidence of past medical records on which Dr. Culver relied in examining Thornton. Thornton has not identified which records he seeks to exclude. Without more, the Court cannot rule on Thornton's motion. Accordingly, Thornton's *in limine* motion on this issue is DENIED at this time.

## IV. OTHER EVIDENCE OF THORNTON'S CRIMINAL RECORD AND EVIDENCE OF THORNTON'S RECEIPT OF SOCIAL SECURITY BENEFITS AND MAINTENANCE AND CURE.

Thornton also seeks to prevent Diamond's vocational rehabilitation expert, Todd S. Capielano, from referring to Thornton's criminal record. Diamond has not opposed this motion and its counsel stated at the pretrial conference that it did not plan to refer to Thornton's criminal history. Accordingly, the Court GRANTS Thornton's motion to exclude any reference to his criminal history.

Thornton also seeks to exclude reference to his receipt of Social Security disability benefits and maintenance and cure payments on the ground that both sets of benefits constitute collateral sources. Again, Diamond has not opposed Thornton's motion, and its counsel represented at the pretrial conference

that he would not refer to such benefits. Accordingly, the Court GRANTS Thornton's motion to exclude reference to his receipt of Social Security disability benefits and maintenance and cure payments.

## V.   CONCLUSION

For the foregoing reasons, the Court GRANTS in part and DENIES in part each party's motion concerning the admissibility of the investigation report, later job safety analyses, and evidence of subsequent remedial measures. Thornton may offer redacted copies of the Incident Investigation Report and the HSE Alert bulletin. He may not introduce other evidence of Diamond's remedial actions except to controvert any assertion that such measures were not feasible or for impeachment purposes. The Court GRANTS in part and DENIES in part plaintiff's motion *in limine* concerning defendants' medical expert. And the Court GRANTS plaintiff's remaining motions *in limine* concerning his criminal history and receipt of collateral source benefits.

New Orleans, Louisiana, this 19th day of May 2008.

_____

SARAH S. VANCE
UNITED STATES DISTRICT JUDGE

26